EXHIBIT "A"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARGUERITE BAGAROZZI

                         Plaintiff,

         -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION; SHOMARI AKIL, PRINCIPAL
of QUEENS ACADEMY HIGH SCHOOL;
NATHIFA MORRIS, ASSISTANT
PRINCIPAL of QUEENS ACADEMY HIGH
SCHOOL,

                       Defendants.

**SECOND
AMENDED COMPLAINT**

18-cv-04893 (RA)

JURY TRIAL DEMANDED

---

Plaintiff **MARGUERITE BAGAROZZI**, by and through her attorneys GLASS &

HOGROGIAN LLP, as and for her Second Amended Complaint, alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff tenured English teacher Marguerite Bagarozzi brings this action against

the New York City Department of Education ("NYCDOE"), as well as her former Principal,

Shomari Akil, and former Assistant Principal, Nathifa Morris, (1) pursuant to 42 U.S.C. Section

1983 for retaliation based on her union activities as protected by the First Amendment; (2)

pursuant to the Age Discrimination in Employment Act ("ADEA") for discrimination,

retaliation, and hostile work environment; (3) pursuant to Title VII of the Civil Rights Act of

1964 ("Title VII") for discrimination, retaliation, and hostile work environment; (4) pursuant to

the New York State Human Rights Law ( "NYSHRL") for discrimination, retaliation, and hostile

work environment due to her age and race; and (5) pursuant to the New York City Human Rights

1

Law ("NYCHRL") for discrimination, retaliation, and hostile work environment due to her age and race.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action involves the First Amendment, ADEA, Title VII, and Section 1983.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 (b) and (c) because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

4.      Plaintiff Marguerite Bagarozzi is a resident of the City of New York and State of New York.

5.      At all times relevant herein, Defendant NYCDOE is a city school district established pursuant to Title II, Article-52-A of the New York State Education Law, NY Educ. Law Section 2590 *et seq.*, and a recipient of federal and state funds.

6.      At all times relevant herein, Shomari Akil was the Principal of Queens Academy High School, a high school in District 25 of Queens, New York, within the NYCDOE. Upon information and belief, he is approximately 53 years old and is black.  He is sued in his individual and official capacity.

7.      At all times relevant herein, Nathifa Morris was an Assistant Principal at Queens Academy High School in Queens, New York, within the NYCDOE. Upon information and belief, she is approximately 40 years old and black.  She is sued in her individual and official capacity.

## FACTUAL ALLEGATIONS

8.      Plaintiff has been employed as a high school English teacher at Queens Academy

High School ("the School") since 2007.

9.      She has been teaching within the NYCDOE since 2000.

10.     Plaintiff has generally been rated Satisfactory and/or Effective and/or Highly

Effective throughout her teaching career.

11.     Plaintiff is 68 years old and white.

12.     Plaintiff is among the eldest and most senior teachers at the School.

13.     Plaintiff was the surrogate for the union chapter leader for the Jamaica campus of

the School since the beginning of the 2016-17 school year. As union surrogate for the Jamaica

campus, Plaintiff acted on behalf and in the stead of the former union chapter leader, Jennifer

Squires.

14.     Defendants Akil and Morris are significantly younger than Plaintiff and black.

15.     Upon information and belief, Defendant Akil has been principal at the School

since the 2015-16 school year. However, Defendant Akil was removed as principal of the School

in or around August 2017.

16.     Upon information and belief, Defendant Morris was excessed from the School in

or around September 2017.

### First Amendment Retaliation

17.     During the 2016-17 school year, Plaintiff filed grievances on behalf of herself and

other staff members at the School as surrogate to the union chapter leader.

18.     On November 14, 2016, Plaintiff filed a grievance on behalf of the faculty and

staff at the School regarding parking permits that were not extended to all staff members at the

school. Following the filing of this grievance, all faculty and staff were granted the privilege to

park by the back of the School.  Parking privileges were rescinded shortly thereafter; yet there were several non-white faculty members that continued to park in the lot.

19.     On December 1, 2016, Plaintiff filed a grievance against her administration on behalf of students at the School relating to students with special needs not receiving mandated services, which was in violation of city and state law. Eventually, as a result of this union grievance, a self-contained special education teacher was hired at the school.

20.     Shortly thereafter, on or about February 1, 2017, Plaintiff, along with chapter leader Jennifer Squires, grieved the administration's failure to file an Occurrence Report about an incident with a student.

21.     On May 1, 2017, Plaintiff filed a grievance for improper post-evaluation procedures relating to observations conducted on April 20 and 26, 2017.

22.     On May 23, 2017, Plaintiff filed a grievance relating to a disciplinary letter to file which was issued to her more than three months after an incident, in contradiction of contractual provisions.

23.     In filing these aforementioned grievances, Plaintiff engaged in union advocacy and representation on behalf of other union members, which qualifies as conduct as a private citizen, and which is protected under the First Amendment.

24.     Additionally, the grievances that Plaintiff filed touched on matters that affected not just Plaintiff individually, but which affected all or many union members at her school. **The grievances regarding special needs violations at the school filed on behalf of students touch upon matters of public concern.**

25.     Following the issuance of these grievances, during the second half of the 2016-17 school year, Plaintiff suddenly started receiving less-than-effective evaluations after having

4

received a Highly Effective Measure of Teacher Performance ("MOTP") and Effective Advance
Overall Rating the year before.

26.     Plaintiff ultimately received a Developing MOTP rating during the 2016-17
school year as a result of these less-than-effective evaluations.

27.     Plaintiff also received unwarranted disciplinary letters from administration and
became the subject of unwarranted investigations during the 2016-17 school year.

28.     Specifically, after Plaintiff fell at school on December 22, 2016 due to a slippery
floor, Defendant Akil falsely accused Plaintiff of intentionally falling in order to defraud
Defendant NYCDOE of medical leave time. Defendant Akil initiated an unwarranted
investigation with the Special Commissioner of Investigation for the New York City School
District ("SCI"), which was substantiated by SCI, but later unsubstantiated and dismissed by an
impartial Section 3020-a hearing officer at Plaintiff's subsequent disciplinary hearing.

29.     On March 10, 2017, Defendant AP Morris issued Plaintiff a letter advising her to
change her grading policy. Plaintiff complied with this directive, yet Defendants failed to
memorialize this in writing.

30.     On May 5, 2017, Assistant Principal ("AP") Derek Phillips issued Plaintiff a
disciplinary letter, at the direction of Defendants, substantiating an allegation of verbal abuse
against her, which was issued late to her, in violation of the UFT-DOE contract.

31.     On May 18, 2017, AP Phillips, at the direction of Defendants, issued Plaintiff
another letter informing Plaintiff once again that the same allegation as contained in the May 5,
2017 letter was substantiated, again which was issued late to her, in violation of the UFT-DOE
contract.

32.    Plaintiff filed an Improper Practice Charge with the Public Employment Relations Board ("PERB") on or about August 10, 2017.

33.    On August 16, 2018, PERB Administrative Law Judge Elena Cacavas issued a decision holding that Defendants Shomari Akil and NYCDOE retaliated against Plaintiff due to her union activities by issuing her the May 18, 2017 letter to file and by preferring Education Law Section 3020-a charges against her, which may have collateral estoppel effect on her First Amendment retaliation claim herein. **Defendant NYCDOE appealed the ALJ's decision, but the appeal was affirmed by the PERB appeal board that Plaintiff was the victim of union-based retaliation, as noted by the attached decision dated December 17, 2018.**

**Discrimination and Hostile Work Environment Due to Age and Race**

34.    Plaintiff is aware of similarly situated, younger, non-white teachers at the School who have been treated better than Plaintiff, including, but not limited to, not being given advance notice of meetings and observations on numerous occasions that the similarly situated younger non-white teachers, such as Yisena Leon and Lynnea Moore, were given notice of.   **Ms. Leon and Ms. Moore are significantly younger than Plaintiff and nonwhite.**

35.    Upon information and belief of Plaintiff, Defendants issued letters to file to and held disciplinary conferences exclusively and only with white teachers at the school.

36.    In or around October 2016, Plaintiff injured her foot/toe and had difficulty walking. She requested from Defendant Principal Akil permission to park closer to the school, but he denied her request. However, Plaintiff was aware of other younger, non-white teachers, **including Yesenia Leon, Lynnea Moore, and Dr. Lawrence,** who had been given permission to park closer to the school than Plaintiff by Defendant Akil.

6

37.     Additionally, Plaintiff was denied the opportunity to earn certain per session income during the 2015-16 and 2016-17 school years than similarly situated younger, non-white teachers were given. These opportunities were not even posted by the school administration, as they should have been, but were rather directly given to certain individuals by Defendants. Although Plaintiff did receive some per session income during these two school years, the majority of opportunities were only offered directly to younger, non-white teachers. Had these opportunities been publicly posted and available for Plaintiff to apply to, she would have sought to work in such capacity.   **Specifically, for the summer of 2017, Plaintiff was offered two summer employment per session teaching opportunities in early or mid June 2017 at Bryant High School and Pathways High School in Queens, NY.  Plaintiff was not allowed to take these positions because of pending Section 3020-a charges during this time period. This caused approximate loss of pensionable income of about $4,000-$5,000.   Plaintiff was told by DOE communications that she could not accept these positions with 3020-a charges pending and did not want to risk additional discipline by taking a position she was not entitled to.**

38.     **In late May and early June 2017, Plaintiff was not permitted to conduct Regents tutoring at Queens Academy for six hours of week, which resulted in a loss of approximately $1,000 in pensionable income.  Because of the pending Section 3020-a charges, she was not allowed to accept this tutoring.  Previously to the charges, Plaintiff had retention rights for this per session activity and was guaranteed the position in English.**

39.     On or about May 25, 2017, Plaintiff was reassigned from her teaching assignment because she had been served with Education Law Section 3020-a ("3020-a") disciplinary charges that same day. However, Plaintiff remained in the building at all times. Upon information and

belief of Plaintiff, Defendant Akil made the decision to initiate and serve Education Law Section 3020-a charges on Plaintiff.

40. The Section 3020-a charges contained five distinct specifications relating to two alleged incidents.

41. The first allegation dated back to the 2014-15 school year, while the second allegation dated back to the 2016-17 school year.

42. Because of Plaintiff's reassignment from her duties, as noted above, she has been unable to earn any per session and summer school pay—which she had obtained the previous three years—causing her significant economic loss.

43. Indeed, Plaintiff was initially offered a summer school position, but, as noted above, was unable to pursue this opportunity due to her pending Section 3020-a case.

44. From May 25, 2017 until the end of the school year, the school administration denied Plaintiff access to her classroom to collect her personal and professional belongings. Plaintiff had no access to her library of materials, costly decorations and various accoutrements, resulting in personal financial loss.

45. On June 21, 2017, the School's annual Staff Potluck Luncheon took place. Plaintiff was the only teacher not given an email regarding this event.

46. On June 28, 2017, the School's graduation ceremony took place. Plaintiff was the only individual not invited to the ceremony.

47. On or about July 3, 2017, due to her pending Section 3020-a hearing, Plaintiff went to the School to obtain a copy of her personnel file, as was her right. From about May 25, 2017, Plaintiff had repeatedly requested access to her file, but the school administration denied such access.

48.     On July 3, 2017, when she arrived at the School, AP Phillips denied Plaintiff the opportunity to see her file after three requests. Only after Plaintiff threatened to contact her union and SCI was she granted access to her file in the fall of 2017.

49.     Upon examining her file, Plaintiff saw that new letters had been placed in her file that she had never seen, in contravention of lawful procedure.

50.     On August 10, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR") against Defendants, alleging race and age discrimination, as well as retaliation. **This SDHR complaint provided notice to Defendants of a "written verified claim upon which [this] action … is founded," was served on the governing arm of the school district, and done within three months of several of the adverse actions she was suffering, including receipt of 3020-a charges, her reassignment, and denial of per session work for the summer of 2017.**

51.     Beginning October 18, 2017, and continuing on December 12, 13, 19, 2017 and January 3, 8 and 10, 2018, Plaintiff attended scheduled hearing days for her Section 3020-a disciplinary hearing.

52.     On January 30, 2018, Lisa C. Charles, a Section 3020-a Hearing Officer, issued a decision substantiating the allegation dating back to the 2014-15 school year but dismissing the allegation related to the 2016-17 school year against Plaintiff.  She issued Plaintiff a $2,000 penalty as a result of the Section 3020-a hearing.

53.     Notably, the Hearing Officer dismissed every allegation initiated against her by Defendant Akil.

54.     **Defendant Akil did give preferential treatment regarding Section 3020-a charges to similarly situated nonwhite teachers.  Specifically, Zakir Islam, a younger**

nonwhite teacher, was not disciplined with Section 3020-a charges, despite falling at the
school and putting in for leave time.  Specifically, Irene Arholekas, a younger teacher, was
not disciplined with Section 3020-a charges, despite falling at the school and putting in for
leave time.  Neither of these teachers' injury claims were investigated like Plaintiff's similar
on the job injury.

55.     **Defendant Akil also did give preferential parking to younger nonwhite
teachers.  For example, during the 2016-17 school year, Yesenia Leon and Lynnea Moore,
an African-American teacher named Dr. Lawrence, and nonwhite guidance counselor
Brandon Alford were given special parking privileges at the school to park within
restricted areas designated for administrators, which was expressly denied to Plaintiff
starting in September 2016.  Plaintiff has photos of these teachers' cars in restricted areas
during November 2016.  During the Spring 2017 term, Ms. Leon was given advance notice
of meetings and observations and unposted per session opportunities by Principal Akil
during the 2016-17 school year, even while being a very co-teacher of Plaintiff in the same
class.  Ms. Moore, a music teacher at the school, was given advance notice of meetings and
observations as well during the 2016-17 school year.**

56.     Plaintiff received a Notice of Right to Sue letter from the U.S. Equal Employment
Opportunity Commission dated March 5, 2018. A copy of Plaintiff's Right to Sue letter is
annexed hereto.

57.     **Since filing her protected federal discrimination complaint on or about June
1, 2018, and amending her discrimination complaint in late August 2018, Plaintiff has been
retaliated against by the Defendant NYCDOE through her new DOE administrators at the
Queens Academy Flushing site after, upon information and belief, Principal Akil was**

10

forced to resign from the DOE and Assistant Principal Morris was forced to leave. Plaintiff had no issues with the same DOE administrators in the 2017-18 school year when the instant lawsuit was not pending, and she received a Satisfactory overall rating for the 2017-18 school year.

58.     Since the filing of her amended federal complaint based on age and race discrimination, Plaintiff has been blatantly retaliated against this school year by receiving from the Queens Academy Flushing site administration an unprecedented barrage of disciplinary notices against her, culminating in approximately 10 disciplinary letters to file, and 2 poorly rated observations from the school administration during the present 2018-19 school year.   The school administration started to issue these disciplinary notices against her in November 2018.

## FIRST CLAIM FOR RELIEF

### (Against all Defendants – First Amendment Retaliation)

59.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

60.     Plaintiff, as union surrogate chapter leader, filed grievances on behalf of herself and the faculty and staff at the School.

61.     Some of the grievances filed on behalf of Plaintiff touched on matters of public concern.

62.     In particular, Plaintiff filed a grievance on December 1, 2016, regarding lack of mandated services for special education students even though she was not a special education teacher.   Almost immediately upon filing this grievance, Principal Akil initiated an SCI investigation against Plaintiff on December 22, 2016, regarding the circumstances

regarding her fall in the school, which was the genesis of the Section 3020-a charges against her. This SCI investigation was initiated within three weeks of Plaintiff filing this grievance against school administration.

63.     Defendants, through the aforementioned conduct, have violated 42 U.S.C. Section 1983, by retaliating against Plaintiff by advocating for other members and for students as a union surrogate in violation of the First Amendment.

64.     As a result, Plaintiff has suffered damages to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Against Defendant NYCDOE – Age Discrimination in Violation of ADEA)

65.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

66.     Defendants, through the aforementioned conduct, have violated the federal Age Discrimination in Employment Act, by discriminating against Plaintiff by rating her in a less-than-effective manner; issuing her unwarranted disciplinary letters to file; bringing her up on Education Law Section 3020-a disciplinary charges; reassigning Plaintiff away from her duties; and denying Plaintiff the opportunity to earn per session and summer school pay.

67.     As a result, Plaintiff has suffered damages to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Against Defendant NYCDOE – Race Discrimination in Violation of Title VII)

68.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

69.     Defendant, through the aforementioned conduct, has violated Title VII, by discriminating against Plaintiff by rating her in a less-than-effective manner; issuing her unwarranted disciplinary letters to file; bringing her up on Education Law Section 3020-a disciplinary charges; reassigning Plaintiff away from her duties; and denying Plaintiff the opportunity to earn per session and summer school pay.

70.     As a result, Plaintiff has suffered damages to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### (Against all Defendants – Age and Race Discrimination in Violation of NYSHRL)

71.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

72.     Defendants, through the aforementioned conduct, have violated the NYSHRL, by discriminating against Plaintiff by rating her in a less-than-effective manner; issuing her unwarranted disciplinary letters to file; bringing her up on Education Law Section 3020-a disciplinary charges; reassigning Plaintiff away from her duties; and denying Plaintiff the opportunity to earn per session and summer school pay.

73.     As a result, Plaintiff has suffered damages to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Against all Defendants – Age and Race Discrimination in Violation of NYCHRL)

74.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

75.     Defendants, through the aforementioned conduct, have violated the NYCHRL, by discriminating against Plaintiff by rating her in a less-than-effective manner; issuing her unwarranted disciplinary letters to file; bringing her up on Education Law Section 3020-a disciplinary charges; reassigning Plaintiff away from her duties; and denying Plaintiff the opportunity to earn per session and summer school pay.

76.     As a result, Plaintiff has suffered damages to be determined at trial.

## SIXTH CLAIM FOR RELIEF

### (Against Defendant NYCDOE – Retaliation for Age and Race Discrimination in Violation of Title VII)

77.     Plaintiff repeats and realleges all the preceding paragraphs of this Complaint, as if fully set forth herein.

78.     **Since filing her protected federal discrimination complaint on or about June 1, 2018, and amending her discrimination complaint in late August 2018, Plaintiff has been retaliated against by the NYCDOE through her new DOE administrators at the Queens Academy Flushing site after Principal Akil was forced to resign from the DOE.  Plaintiff had no issues with the same DOE administrators in the 2017-18 school year when her lawsuit was not pending and she received a Satisfactory overall rating for the 2017-18.**

79.     **Since the filing of her amended federal complaint based on age and race discrimination, Plaintiff has been blatantly retaliated against this school year by receiving from the Queens Academy Flushing site administration an unprecedented barrage of disciplinary notices, culminating in approximately 10 disciplinary letters to file, and 3 poorly rated observations from the school administration during the present 2018-19**

14

school year.   The administration started to issue these disciplinary notices and letters and poor observations against her commencing in November 2018 through the present day.

80.     **Plaintiff also received an affirmance of her PERB decision by the New York State PERB board on December 17, 2018, a copy which is attached.  To date, Defendants have not, nor made any attempt to, comply with the now affirmed PERB decision.**

81.     As a result, Plaintiff has suffered damages to be determined at trial.

## JURY DEMAND

Plaintiff demands a trial by a jury on all of the triable issues of this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for declaratory relief and damages as follows:

A.     A declaratory judgment that Defendant NYCDOE is in violation of the First Amendment;

B.     A declaratory judgment that Defendant NYCDOE is in violation of the federal ADEA;

C.     A declaratory judgment that Defendant NYCDOE is in violation of Title VII;

D.     A declaratory judgment that Defendants are in violation of New York State Human Rights Law;

E.     A declaratory judgment that Defendants are in violation of New York City Human Rights Law;

F.     Awarding Plaintiff compensatory damages (including but not limited to emotional distress damages) and punitive damages (to the extent available) pursuant to the

ADEA, Title VII, 42 U.S.C. Section 1983, and the New York State and City

Human Rights Law;

G.     Awarding Plaintiff costs and reasonable attorneys' fees; and

H.     Such other and further relief as to this Court may deem necessary, just and proper.

Dated:     New York, New York
           April 30, 2019

                              **GLASS & HOGROGIAN LLP**
                              Attorneys for Plaintiff
                              85 Broad Street, 18th Floor @ Wework
                              New York, NY 10007
                              (212) 537-6859

                              By: *s/ Bryan D. Glass*
                                   Bryan D. Glass, Esq.

16

# EXHIBIT "B"

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

MARGUERITE M. BAGAROZZI,
                                        Complainant,

                    v.

CITY OF NEW YORK, DEPARTMENT OF
EDUCATION,
                                        Respondent.

VERIFIED COMPLAINT
Pursuant to Executive Law,
Article 15

Case No.
**10189699**

Federal Charge No. 16GB704061

I, Marguerite M. Bagarozzi, residing at ███████████████
charge the above named respondent, whose address is Office of Legal Services, 52
Chambers Street, Room 308, New York, NY, 10007 with an unlawful discriminatory practice
relating to employment in violation of Article 15 of the Executive Law of the State of New York
(Human Rights Law) because of age, race/color, opposed discrimination/retaliation.

Date most recent or continuing discrimination took place is 7/3/2017.

The allegations are:

Please see attached complaint form

# New York State Division of Human Rights
## Complaint Form

RECEIVED

JUL 2 1 2017

BROOKLYN REGIONAL OFFICE

## CONTACT INFORMATION

**My contact information:**

Name: *Bagarozzi, Marguerite M*

Address: ███████████████    Apt or Floor #: ██████

City: ███████████    State: ███    Zip: ██████

## REGULATED AREAS

**I believe I was discriminated against in the area of:**

☒ Employment          ☐ Education          ☐ Volunteer firefighting

☐ Apprentice Training    ☐ Boycotting/Blacklisting    ☐ Credit

☐ Public Accommodations    ☐ Housing          ☐ Labor Union, Employment
*(Restaurants, stores, hotels, movie*                      Agencies
*theaters amusement parks, etc.)*    ☐ Commercial Space
                                          ☐ Internship

**I am filing a complaint against:**

Company or Other Name: *NYC Dept of Education - Queens Academy High School*

Address: *142-10 Linden Blvd, 4th Floor*

City: *Jamaica*          State: *NY*    Zip: *11436*

Telephone Number: *718  258  2050*
              (area code)

Individual people who discriminated against me:

Name: *Mr. Shomari Akil*          Name: *Ms. Nathifa Morris*

Title: *Principal*          Title: *Assistant Principal*

          *Mr. Derek Phillips*
          *Assistant Principal*

## DATE OF DISCRIMINATION

**The most recent act of discrimination happened on:**   *07*   *3*   *17*
                                                          month   day   year

## BASIS OF DISCRIMINATION
*Please tell us why you were discriminated against by checking one or more of the boxes below.*

 You do not need to provide information for every type of discrimination on this list. Before you check a box, make sure you are checking it only if you believe it was a reason for the discrimination. Please look at the list on Page 1 for an explanation of each type of discrimination.

**Please note**: Some types of discrimination on this list do not apply to all of the regulated areas listed on Page 3. (For example, Conviction Record applies only to Employment and Credit complaints, and Domestic Violence Victim Status is a basis only in Employment complaints). These exceptions are listed next to the types of discrimination below.

### I believe I was discriminated against because of my:

| | |
|---|---|
| ☒ **Age** *(Does not apply to Public Accommodations)*<br>Date of Birth: ▮▮▮▮▮▮ | ☐ **Genetic Predisposition** *(Employment only)*<br>Please specify: |
| ☐ **Arrest Record** *(Only for Employment, Licensing, and Credit)*<br>Please specify: | ☐ **Marital Status**<br>Please specify: |
| ☐ **Conviction Record** *(Employment and Credit only)*<br>Please specify: | ☐ **Military Status:**<br>Please specify: |
| ☐ **Creed / Religion**<br>Please specify: | ☐ **National Origin**<br>Please specify: |
| ☐ **Disability**<br>Please specify: | ☒ **Race/Color or Ethnicity**<br>Please specify: I AM CAUCASIAN. PRINCIPAL AND TWO APs ARE BLACK. |
| ☐ **Pregnancy-Related Condition:**<br>Please specify: | ☐ **Sex**<br>Please specify: ☐ Female  ☐ Male<br>     ☐ Pregnancy<br>     ☐ Sexual Harassment |
| ☐ **Domestic Violence Victim Status:**<br>*(Employment only)*<br>Please specify: | ☐ **Sexual Orientation**<br>Please specify: |
| ☐ **Familial Status** *(Does not apply to Public Accommodations or Education)*<br>Please specify: | ☒ **Retaliation** *(if you filed a discrimination case before, or helped someone else with a discrimination case, or reported discrimination due to race, sex, or any other category listed above)*<br>Please specify: TARGETING, HARASSMENT, DISCRIMINATION, OSTRACIZATION, EXCLUSION. |

 Before you turn to the next page, please check this list to make sure that you provided information *only* for the type of discrimination that relates to your complaint.

Last revised on 2/09/16          5

# EMPLOYMENT OR INTERNSHIP DISCRIMINATION

*Please answer the questions on this page only if you were discriminated against in the area of employment or internship. If not, turn to the next page.*

**How many employees does this company have?**
☐ 1-3   ☐ 4-14   ☐ 15 or more   ☒ 20 or more   ☐ Don't know

**Are you currently working for the company?**

☒ Yes

Date of hire: DOE( _09_ ___05___ __00__ )   What is your job title? _TEACHER_
                    Month          day        year

☐ No   QUEENS ACADEMY 06                    09

Last day of work:  (_____ _____ _____)   What was your job title? _____
                        Month          day        year

☐ I was not hired by the company

Date of application: (_____ _____ _____)
                          Month          day        year

## *ACTS OF DISCRIMINATION*

**What did the person/company you are complaining against do? Please check all that apply.**

☐ Refused to hire me

☐ Fired me / laid me off

☐ Did not call me back after a lay-off

☐ Demoted me

☒ Suspended me

☐ Sexually harassed me

☒ Harassed or intimidated me (other than sexual harassment)

☒ Denied me training

☐ Denied me a promotion or pay raise

☐ Denied me leave time or other benefits

☐ Paid me a lower salary than other workers in my same title

☒ Gave me different or worse job duties than other workers in my same title

☐ Denied me an accommodation for my disability

☐ Denied me an accommodation for my religious practices

☒ Gave me a disciplinary notice or negative performance evaluation

☒ Other: FILED FALSE DISCIPLINARY CHARGES AGAINST ME AND OSTRACIZED ME IN MY WORKPLACE IN FRONT OF STAFF AND STUDENTS

6

**ADDENDUM TO SDHR CHARGE FOR MARGUERITE M. BAGAROZZI**

1.  I have been employed as an high school English teacher at Queens Academy High School in Queens, New York for the 2016-17 school year, under Principal Shomari Akil.

2.  I have been generally rated Satisfactory or Effective/Highly Effective throughout my 17 year career for my teaching performance.

3.  I am 67 years old and of Caucasian race. Upon information and belief, I am among the oldest faculty members at the school. I have been teaching for the NYCDOE since 2000 and have been at my current school since 2007.

4.  My principal Mr. Akil and his Assistant Principals are all of black race and significantly younger than I. Mr. Akil has been the principal of the school for the past two school years.

5.  During the second half of the 2016-17 school year, I suddenly started to receive lower ratings on my evaluations than I ever received in my career.

6.  I also received disciplinary letters regarding petty incidents during the 2016-17 school year, and found out that negative material had been added to my personnel file in violation of the UFT-DOE contract as of July 3, 2017.

7.  I also received notice of potential false disciplinary Section 3020-a charges against me on or in May 2017, and have been removed from my teaching assignment since May 25, 2017.

8.  I did not receive an overall rating for the 2016-17 school year.

9.  Because of my reassignment from duties, I have not been able to work per session and summer school, causing me significant economic loss.

10. I believe I am being targeted based on age and race discrimination.

## NOTARIZATION OF THE COMPLAINT

Based on the information contained in this form, I charge the above-named Respondent with an unlawful discriminatory practice, in violation of the New York State Human Rights Law.

By filing this complaint, I understand that I am also filing my employment complaint with the United States Equal Employment Opportunity Commission under the Americans With Disabilities Act (covers disability related to employment), Title VII of the Civil Rights Act of 1964, as amended (covers race, color, religion, national origin, sex relating to employment), and/or the Age Discrimination in Employment Act, as amended (covers ages 40 years of age or older in employment), or filing my housing/credit complaint with HUD under Title VIII of the Federal Fair Housing Act, as amended (covers acts of discrimination in housing),as applicable. This complaint will protect your rights under Federal Law.

I hereby authorize the New York State Division of Human Rights to accept this complaint on behalf of the U.S. Equal Employment Opportunity Commission, subject to the statutory limitations contained in the aforementioned law and/or to accept this complaint on behalf of the U.S. Department of Housing and Urban Development for review and additional filing by them, subject to the statutory limitations contained the in aforementioned law.

I have not filed any other civil action, nor do I have an action pending before any administrative agency, under any state or local law, based upon this same unlawful discriminatory practice.

I swear under penalty of perjury that I am the complainant herein; that I have read (or have had read to me) the foregoing complaint and know the contents of this complaint; and that the foregoing is true and correct, based on my current knowledge, information, and belief.

_____
Sign your full legal name

Subscribed and sworn before me
This 2( day of July , 20 17

_____
Signature of Notary Public

County: Rockland   Commission expires: 1/22/18

BRYAN GLASS
Notary Public, State of New York
No. 01GL6068078
Qualified in Rockland County
Commission Expires 1/22/2018

**Please note: Once this form is notarized and returned to the Division, it becomes a legal document and an official complaint with the Division of Human rights. After the Division accepts your complaint, this form will be sent to the company or person(s) whom you are accusing of discrimination.**

9

DESCRIPTION OF DISCRIMINATION…MARGUERITE M. BAGAROZZI

--7/3/17

- I returned to the school this day to view the additional contents placed in my file.  AP Phillips was at the security desk, having a social conversation with the two School Safety Agents who were at the desk.  When I told him why I had visited, he told me: "School is over.  I'm not going to go through files…school is over."  I told him that I had a right to see what had been placed in my file.  He adamantly refused to show me my file three more times, repeating his mantra that school was over, and he did not want to go through that stuff.  I final took out my phone, telling him that I would call the UFT and the Special Commissioner of investigation if he continued to deny me access.  AP Phillips finally gave me access.  There was information in my file relative to the ███████ ██████ matter that should have been removed and given to me as I had asked be done on three occasions via e-mail.—it's being there DELIBERATELY violated the UFT contract because its being there violated the 90-Day Rule and was uncontractual.  The administration including AP Phillips are well aware of this.  There was additional information that should have been sent to me and was not-—another uncontractual action on the part of administration.  AP Phillips refused to remove the material, saying he had to check with the principal—an action which he had promised to do in early June.  When I told him that I would be back on Wednesday, July 3rd, AP Phillips replied that he would be at August Martin High School where some of our students would be attending summer school.  When I noted that he had mentioned that some of our students were attending summer school at Flushing High School, directly across the street from Queens Academy, and that he would have to be of service to them as well, asking when that would be, Phillips replied that he did not know.  In addition, I asked Phillips when he would be at Orientation for new students and their parents—would he not need be present at the school then as well—no answer.  I will continue to try to overcome this obvious denial of my civil, human, and contractual rights.

--6/30/17

- Upon visiting the school on another matter, I was informed by School Secretary Lorraine Sasso-Russo that additional material had been placed in my file without my knowledge.  I asked her to show me the file which she could not do because Principal Akil had removed the key to that file cabinet from her possession.  I asked where AP Phillips was on this work day and was told that he was not in the building and no one knew where he was.

--6/28/17

- I sent an e-mail to school secretary Paulette Guilford-Crawford asking that she forward me via registered mail the evidence AP Morris was to send me relative to charges filed against me and asking that she contact me when she had completed this task.  She never responded.

--6/28/17

- I was not invited to the school's graduation ceremony to which every other faculty member was.
- As a senior faculty member, I was denied the right in addition to recommend students for the English awards at graduation—there is only one other English teacher at the Jamaica site who

had never taught there prior to the term before graduation (Spring, 2017) and had not had most of the students in her classes, knowing very little about their suitability for awards.

--6/26/17

- Third Notice sent to Principal Akil requesting my right to obtain evidence re charges against me, particularly re ██████ which violated the UFT contract by being placed there at all.

--6/8/17

- I was prohibited from attending the ESKOLTA Conference to which every other faculty member was invited as were numerous staff.  There were no students in attendance, and I alone was denied my contractual right to professional development.

---6/1/17

- I sent an email to AP Nathifa Morris asking that she forward me a copy of an e-mail that I was supposedly sent by "an administrator" directing me to "revise lesson plans, unit plans, and curriculum maps using the scope and sequence model and the New Visions Curriculum" (the latter of which was never supplied to me nor was it approved for use by the district superintendent).  I never received the original e-mail because it was never sent, and AP Morris never furnished me with the copy.

--5/26/17

- Sent SECOND Request e-mail to Principal Akil to provide evidence in findings re ██████ matter.  The point should be moot because AP Phillips continued an investigation with a substantiated finding after the initial disciplinary meeting in which the evidence was insufficient to corroborate.  The time limit expired shortly thereafter, but AP Phillips continued to investigate in violation of the Ninety-Day Rule imposed contractually by the UFT.  A third request followed on 6/26/17.

--5/25/17-present

- Deleted me from the staff address book on the Department of Education website, thereby excluding me from receiving pertinent information such as reporting times, end of term checklists, recommendations for student award recipient for graduation when the only other English teacher had recently transferred from the other site and had taken a leave for the entire fall term and barely knew the students, and similar important matters pertinent to me even as someone re-assigned to administrative duties…I was totally ostracized.
- Total exclusion in some manner from summer school activities at other schools, including the school where I had taught summer school for the last three summers…I did not receive one call or email asking my availability when in the past I had received numerous requests to consider positions and/or appear for interviews.

--6/27/17

- Abruptly cancelled without notice a disciplinary hearing relative to new charges in my case, causing continued and anxiety to me and extreme inconvenience to my UFT Representative who

is assigned to the other site a number of miles away—I was informed by the secretary as well that the principal did not know when the meeting would be re-scheduled

--6/28/17

- Excluded me entirely from the graduation ceremony without consideration or notice when all other faculty and staff were invited

--6/23/17

- AP, IA Nathifa Morris emailed all faculty except me that Tuesday, the 27th, is an instructional day and the instructional schedule of 9 AM-3:20 PM is to be observed.  We had previously been observing the Regents Week schedule of 8:30 AM-3:20 PM.

--6/21/17

- Exclusion from Staff Potluck Luncheon and all correspondence relative to it—all other staff at the site were included and were sent e-mails by AP, IA Nathifa Morris and School Secretary Paulette Guilford-Crawford concerning same on the following dates:  6/20/17; 6/16/17; some staff replied on the following dates:  6/20/17, 6/19/17.  I was the only person not included on the e-mail chain—see addressees.  Approximately one-and one-half hours after the luncheon began, AP,IA Morris came to my holding area to ask if I "wanted a plate" after everything had been picked over and most of the food had been consumed.  She brought Guidance Counselor Brandon Alfred as a witness to verify that I had been asked—itself discriminatory and demeaning.

--6/21/17

- Queens Transition Center Principal Fritzi Sannon-Brown who is responsible for the school safety meetings for both our schools informed me when I asked her why I had not been invited to that day's school safety meeting that Queens Academy AP, IA Nathifa Morris told Ms. Brown when she inquired if I were attending the meeting told Principal Brown "no" and that I was not permitted to leave the fourth floor where Queens Academy is located.  I am not the Queens Academy representative as such but serve as the Queens Academy UFT representative to the meeting for the school's faculty as a surrogate for the school's chapter leader Ms. Jenny Squires and had done so for the entire year.  Prior to this, on the occasion of the last two school safety meetings, Queens Academy Principal Shomari Akil called QTC AP Marrotta-Perretti  who chaired the meetings that she was to table Queens Academy business until he arrived–once he arrived fifty minutes late, the next he did not arrive at all.
Neither Ms. Morris nor Mr. Akil had the authority to dictate policy where the UFT and its representative are concerned.  I was prohibited, even after I voiced complaints about the inappropriateness of their actions, from expressing the concerns of the faculty.

I informed Mr. Akil verbally and Ms. Morris via e-mail that their actions were uncontractual and that I was reporting them to the UFT.

--6/19/17

- Exclusion from Professional Development activity on bi-polar disorder, the last part of a continuing series on mental health for students and faculty.

--6/19, 20, 21/17

- Consistent scheduling of events in Room 419 (my classroom) to ensure that I did not have access to the room to prepare it and its contents for a prospective move. All other faculty with assigned classrooms were given multiple opportunities over a number of days to accomplish related tasks.

--6/16/17

- AP, IA Morris and Principal Shomari Akil assigned me to a holding area at the school at which I teach with instructions to have no student contact after removing me from the classroom on May 25, 2017. My movements were extremely limited because we are on one floor only of a four story building housing another school. The room (431B)has windows that either don't open or don't open easily; does not have air conditioning or proper ventilation; is dirty and dusty; contains a copy machine and two riso machines, a bookcase of unwanted books, and various other detritus that renders it uncomfortable at best and hazardous at worst. After making the best of the situation for 15 days, when the weather turned to the high eighties and nineties, I moved myself to the faculty lounge which is ventilated and has air conditioning, resolving my health concerns somewhat. I had a doctor's note in my personnel file attesting to my need for some very minor accommodations. I also anticipated the need for an updated note and secured one on May 30, 2017. Ms. Morris sent me an e-mail on this date, stating that I did not have permission to move. I replied, outlining the reason for the move. She then e-mailed AP Derek Phillips at the other site where the personnel files are housed, asking him if he had seen the original note. Morris then asked me for a copy of the updated note which I sent immediately. All this interaction took place in less than an hour of my leaving school; therefore, she could not accuse me of obtaining a new note and having the doctor pre-date it.

--5/19/17

- I reported to Principal Akil's office with my UFT representative Ms. Jenny Squires. When we arrived, I was presented with a copy of a letter dated 5/16/17 informing Chancellor Carmen Farinha that an investigation conducted by The Special Commissioner of Investigation for the New York City School District substantiated a complaint filed by Principal Akil on December 22, 2016, that I falsified a report relative to my falling at school that day and recommending that I cobe terminated. I submitted a report, continued working, blamed no one, did not seek medical

attention, and considered the matter closed.  What the principal did not include was that he tried to erase the scuff mark made by my shoe on the slippery floor, providing evidence of the nature of the fall.

--5/25/17

- I was told to report to Principal Akil's office by Nathifa Morris, AP, IA. I was given another letter in which the principal substantiated the charge and removed me from the classroom.
- I was relocated to Room 431B—the copy room—which is not air conditioned, is poorly ventilated, dirty, dusty, and contains retired books, machines, computers and other detritus, two riso machines, and a copy machine--these three machines generating a great deal of heat and chemical exhaust—further contributing to the unhealthy atmosphere in the room.

--5/24/17

- While I was teaching my Period 6 class, I was interrupted by AP,IA Morris who demanded that I report to the Principal's Office immediately—no reason was given.  When I appeared, a student, his mother, his aunt, the principal, and the AP interrogated me relative to the student's  no longerperformance, grades, my behavior toward him, my teaching style, and the like.   I received no notice at all, was addressed disrespectfully by all concerned, and, according to all protocols of appropriate behavior, was not treated fairly and was verbally abused by all.  A similar meeting had been held the prior week of so with another teacher who is Puerto Rican but who had been given at least a day and a half's notice to prepare for the meeting.
- I was also observed this day with no notice—four other teachers (three of whom were minorities including the Puerto Rican teacher) had also been observed but had been given prior notice of at least one day.  I never received notice of when I was being observed.

--03/27/17

- AP, IA Nathifa Morris harassed me twice this day.  Once, she pulled me out of class to meet with a parent and student whom I had just seen the night before at Parent/Teacher Conferences.  The student had poor attendance and had failed the first marking period.  I was never notified that the student had a heart condition and was being treated medically—the school notoriously withholds this information even in general terms—and I told the parent and student that now that I  called me out of my Period 2knew, I would accommodate the student in any and every way.  I was taken at my word which was later borne out.  Morris called the parent and insisted that she come to school the following day to confront me about the grade, giving the parent no choice because of the severity of the situation as was presented by Morris.  The parent and student waved to me and said they would see me later.  I was summoned shortly thereafter and interrogated by Morris for approximately twenty minutes.  I tried to tell her that the issue was no longer of concern to anyone, but she kept intensifying her unprofessional, abusive rant.  I told her that I had to return to class.  The parent and student stopped by my room on their way out, apologizing profusely for what had occurred.  The parent mentioned that Morris had been

relentless in her insistence that they appear that day.  The parent told me that something was going on passed what had occurred just prior and that if I needed her to speak in support of me, she would be happy to do so.

- AP, IA Morris came looking for me and was on her way to the rest room where I had just gone to retrieve me for a Monday Professional Development meeting.  Other teachers told her that I had just left the room, but she refused to listen.

03/14/17

- When I inquired, the Principal told me in a common planning meeting that a student who had threatened me with harm, thrown a stapler at another student in class, and menaced yet another student in my Period Six class had been suspended.  Not only was the student not suspended, but she was returned to my class shortly after the incident—the principal had never filed the ORRS report.

02/2017

- All faculty at both campuses had received their scholarship reports for the prior term—I was the only one who had not.  I requested it numerous times before I finally received it.

01/17/17

- A student appeared for a Regents examination which I was proctoring.  She had two black eyes and was visibly upset.  I reported this to the ATR Guidance Counselor Yasmeen Troutman and special education teacher Yisenia Leon who were sitting in the hall chatting.  They informed me that the student was eighteen years old but had just given birth and that I should report it—that the incident had occurred the prior week.  I asked them why they had not reported it when it first happened; they did not answer.  I reported the matter to the principal and the guidance counselor Brandon Alfred, called the mandated reporter hotline, then returned to tell the administrators that two other staff had seen this but had not reported it when it occurred.  They told me that I was required to report it…I continued to ask why the other two staff had not and was told to drop it.

--9/29/17-11/17

- DoE Access Inquiry Institute—I obtained a $90,000 grant for three years ($30,000 per year) to provide materials, trips, advisement meetings, guest speaker, et al.  I wrote the access plan and attended all the meetings then was denied access not only to funds but to even seeing the what the budget lines were, and where/how much money was allocated on each line, et al.

--11/2/16

- The Principal called me out of my Period 2 class to speak with a parent, refusing to wait until the end of class.  In this meeting, he literally yelled at me thrice in front of the parent and the student and refused to let me rebut the student's accusations.  I did so regardless, speaking over him and his rudeness to and disrespect of me.  I had documentation for everything that I

claimed, pointing out that the student had not been telling the truth—at all.  The parent was mollified, but no apology was forthcoming from the principal.

--10/5/16-5/24/17

- I was observed nine times.  The principal observed me six of those times, never giving me any feedback—positive or negative until the last class day when he arrived to conduct a post-observation without prior notice and then proceeded to leave the room, stating that he would return which he did not do until late afternoon.  We briefly discussed Andrew Carnegie's "Gospel of Wealth"; he suggested that I should have used DuBose a black author instead to be more culturally attuned to our students.  When I said that the Common Core dictates work from various centuries and that I had used Carnegie from the 19th Century, he stated that I still should have used Dubose.  Dubose is considered 2oth Century—he did not know this.  In addition, he asked why I do argumentation in class.  When I explained that it was a major component of the Common Core ELA Regents and the students needed scaffolded assignments to prepare them, he replied that there were four essays, why focus on argumentation.  There is only one essay on the Common Core ELA Regents—argumentation.  He did not know this.
- I was rated "Highly Effective" for the academic year 2015-2016 by Principal Akil.  This academic year 2016-2017, many of my Danielson Rubric components have been rated "Developing" or "Ineffective" by the inexperienced, non-appointed AP,IA Nathifa Morris who has never taught high school or been an AP prior to this assignment.  AP Derek Philipps rated me all "Effective" except for one "Developing" in my November 22, 2016 post-observation report—this was because the principal had told me to change my lesson plan format which he later denied saying to AP Philipps when AP Philipps questioned him.

--10/28/16

- Principal observed me unannounced during Period 2 and left the room four times, distracting the students who were present—a number of whom were special education students.  The Principal had his walkie-talkie on during the entire time—it crackled continuously disturbing the students further as did the messages he was receiving over the device.

--10/17/17—present

- I filed numerous ORRS Reports for serious reasons— a minimum of two of which were the most egregious threats to my personal safety:  one, a student had pushed with both her arms and then hit me with her tote bag; another, a student who threatened me with harm if I spoke with his mother and girlfriend about his abusive behavior and verbal abuse of me on a consistent basis.  There were    ORRS in total.

--9, 10, 11/16

- I broke and dislocated the ring toe of my left foot; in addition, I have a neuroma in that foot.  Despite my difficulty, I did not miss one minute of work.  I had not received a DoE street parking

pass yet so I had to walk (limp) from wherever I found parking, sometimes three-four city blocks away.  I asked Principal Akil if I could be accommodated in the school lot in the rear of the building; he refused to do so, yet offered parking in the rear lot to the new African-American female teacher, the substitute African-American male teacher, and the new Puerto Rican special education teacher.  I filed a grievance which he disallowed.

--9/16

- The Principal took away my access to YouTube when numerous other mostly minority faculty members had access to it.  I teach English, and in order to differentiate and offer various entry points as well as visual learning opportunities to students, particularly special education students, I was forced to show them speeches and the like on my mobile phone.
- The Principal repeatedly initiated meetings with me before and after school, on my prep and lunch periods for which I was not compensated.
- Attempted to require me to participate in two full-time Circular Six assignments which is a decided violation of the UFT contract.  I would have been required to be the College Advisor for one period and a participant in Common Planning as well.  The principal required me to attend a meeting with two staff members (both minorities—one African-American male; one Sikh female) in which he verbally chastised me, raised his voice to me, and disrespected me by not permitting me to rebut obvious lies and purposeful misstatements on the part of the other participants regarding college advisement.  He refused to reprimand Gurpreet Grawal (Sikh female) and Brandon Alfred (African-American male) for refusing to meet with me to develop plans for college advisement.
- Told me to re-arrange my room to separate latecomers and chronic absentees from the main body of students in the class and to give these students alternative lessons and assignments; he also recommended that I change my lesson plan format to include such elements as empathy and to include only one learning objective…these requests are in violation of the UFT Contract.  He "approved" the final copy and then denied doing so in 11/16 when AP Derek Philipps questioned him about what had transpired because that was the only area in which Mr. Philipps had rated me "Developing" in his November, 2016, observation report.  All other elements were rated "Effective."

HABITUAL:

- refuses to address me by my EARNED TITLE of DR. but addressed  a student's aunt repeatedly in a meeting with me by the title while referring to me by my first natee or "Ms."  Repeatedly addressed the substitute music teacher by the term, bu constantly referring to me by my first name or Ms.  Both these people are black.
- Regularly called me "Margarita", not "Marguerite" even after he was corrected numerous time over a two-year period.

EXHIBIT "C"

THE STATE EDUCATION DEPARTMENT
UNIVERSITY OF THE STATE OF NEW YORK
----------------------------------------------------------------------X
In the Matter of the Disciplinary Proceeding between

**NEW YORK CITY DEPARTMENT OF EDUCATION**,                    SED File No. 32,002

Complainant,

and                                                                                            **OPINION**

**AND**

**MARGUERITE BAGAROZZI**                                                       **AWARD**

Respondent.

Pursuant to Education Law Section 3020-a
----------------------------------------------------------------------X
Before **LISA C. CHARLES, Hearing Officer**


**APPEARANCES:**

**For the Complainant**
   **Kereen Evans-McKay, Esq.**
   **NYC Department of Education, Office of Legal Services**

**For the Respondent**
   **David Eisenstein, Esq.**
   **Office of Robert T. Reilly**

## INTRODUCTION

Pursuant to the provisions of New York State Education Law §3020-a, I was

appointed to hear and decide whether there is just cause for the proposed disciplinary

action against Respondent, Marguerite Bagarozzi.  The pre-hearing conference was held on

October 18, 2017. Hearings were thereafter conducted at the offices of the New York City

Department of Education at 100 Gold Street in New York City, New York on December 12,

13, 19, 2017, and January 3, 8, and 10, 2018, when the record was closed.

Both parties were represented by counsel in this proceeding and had a full and fair

opportunity to adduce evidence, cross-examine witnesses and make arguments in support

of their respective positions.  The evidence adduced, the legal authorities cited and all the

positions and arguments set forth by the parties have been fully considered in the

preparation and issuance of this Opinion and Award, whether or not specifically mentioned

herein.

## CHARGES AND SPECIFICATIONS[1]

**MARGUERITE BAGAROZZI** (hereinafter referred to as "Respondent"), under
File No.776305, is a tenured teacher assigned to the Queens Academy High
School located in Queens, New York.  During the 2014-2015 and 2016-2017
school years, Respondent engaged in conduct unbecoming her profession
and neglected her duties as follows:

### In Particular:

**SPECIFICATION 1**: On or about April 13, 2015, Respondent:

1. Refused to assist student ███ when he asked for an explanation regarding
   written feedback given to him by the Respondent for revising an essay.

2. Caused ███ to experience stress, and/or anxiety, and/or panic, and/or
   feel uncomfortable.

**SPECIFICATION 2**:  On or about December 22, 2016, Respondent
attempted to defraud the New York City Department of Education in
order to gain a personal benefit, in that Respondent deliberately staged
her own fall, in that she placed a bag on the ground and proceeded to trip
over it.

**SPECIFICATION 3**:  On or about December 2016, Respondent attempted
to defraud the New York City Department of Education in order to gain a
personal benefit, in that Respondent completed and submitted
document(s) purporting to explain an incident pertaining to an injury
that allegedly occurred back on December 22, 2016, when in fact such
incident or injury did not occur.

---

[1] D1. Exhibits will be referred to herein as J for Joint, D for Department, and R for Respondent
followed by the number.

**SPECIFICATION 4:**  By committing one, some or all of the actions described in Specifications 1, Respondent acted in a manner that had or would have had the effect of unreasonably and substantially interfering with a student's mental, emotional, or physical well-being.

**SPECIFICATION 5:**  By committing one, some or all of the actions described in Specifications 1, Respondent knowingly acted in a manner likely to be injurious to the physical mental or moral welfare of a child less than seventeen years old.

### The foregoing Constitutes:

-Just cause for disciplinary action pursuant to Section §3020-a
 of the Education Law:
-Neglect of duty;
-Verbal abuse
- Substantial cause rendering Respondent unfit to perform her obligations properly to the service;
-Conduct unbecoming Respondent's position, or conduct prejudicial to the good order, efficiency, or discipline of the service;
-A violation of the By-laws, Rules and Regulations of the Chancellor, School
 and/or District;
-Just Cause for termination

### BACKGROUND

Respondent Marguerite Bagarozzi is a tenured teacher, who has been employed by the Department since September 2000, and has worked at Queens Academy High School since September 2007, where she teaches English classes. Prior to her employment with the Department, the Respondent was a teacher and/or administrator at several colleges beginning in 1970.  Queens Academy High School (School) is an alternative high school that serves students 16 to 21 years old who are behind in their graduation credits for their age. At all material time, either Vasilios Manolios (Principal Manolios) or Shamari Akil (Principal Akil) were the School's leaders. During the 2014-2015 school year, the timeframe alleged in Specifications 1, Respondent taught a class entitled Man's Inhumanity

to Man, in which student ███ (hereafter referred to as Student H[2]) was enrolled. Student H claims that Respondent refused to assist him with an essay assignment and he failed the class. During the 2016-2017 school year, the timeframe alleged in Specification 2, the Respondent fell in the hallway outside of her classroom.

## FACTS

The Department presented Student H, who testified that he was behind in his graduation credits because he took a leave from high school for health reasons, that he transferred to the School because his brother had attended and had a good experience, that the teachers at the School were better than the ones at his previous high school, and that his grades improved and he participated in extra curriculum activities at the School. Student H said that prior to this incident, he had an Advisory class with the Respondent, that the Respondent supported him on his run for Student Counsel President, and that she wrote him a recommendation for college.

Student H testified that when he took the Respondent's class entitled Man's Inhumanity to Man, she gave the class a rubric, that explained how to write the introduction and the following paragraphs for the final essay assignment, and that he turned in an outline and the Respondent helped him with it. Student H said that he turned in a draft essay on which Respondent wrote comments. She also made comments on the rubric.

---

[2] The full name of each student was provided to Respondent, however to protect student confidentiality, the students will be referred to herein by letter.

The Respondent's comments on Student H's rubric after his first draft are:

**I reviewed your work with you, went over the outline and checklist, works cited, et al. You have come nowhere near fulfilling the requirements of this essay. Even the format does not approach proper style. I have also modeled every aspect of the assignment-did you not listen? Re-do!**

Student H said that he asked the Respondent for help and she said "no." She told him to follow the comments she had written, but he did not understand what her comments meant. Student H said that the Respondent did not explain why his essay was wrong. She gave him no guidance on how to correct the essay, but she gave that assistance to other students. Student H said that he sought assistance to rewrite the essay from other students, the other English teacher, and the Children's Based Organization (CBO) director who is stationed at the School, and that he rewrote the essay. Student H said that the Respondent told him that he was not allowed to ask students for help and moved one student's seat to prevent him from helping.  Student H stated that that he was unaware of the importance of the final essay grade until a student told him that the essay would be the determining factor for his grade in the class, and that he was panicked about not passing the class because of a low score on the essay.

The Respondent's comments on Student H's second attempt are as follows:

**You have not met the requirements of this essay. You have refused to accept constructive criticism from your peers and you have ignored me and my attempts to assist you. The result speaks for itself. 1.5**

Student H testified that he, his mother and brother met with the Respondent and Principal Manolios to learn what he could do to pass the class, but the Respondent made a

rude comment to his mother and the Respondent left the meeting. Student H said that he filed a complaint that the Respondent refused to assist him.

The Department presented Principal Manolios, who was the interim acting Principal during the 2014-2015 school year. He stated that Student H's mother requested the meeting with him and the Respondent to find out what could be done to help Student H pass the class. Principal Manolios said that he scheduled and attended the meeting with Student H and his family and the Respondent. He quoted the Respondent as saying to Student H's mother, who is partially blind, "Unlike you I can see," and that the Respondent left the meeting.

Principal Manolios testified that he conducted the school-based investigation of Student H's complaint. Principal Manolios said that he interviewed Student H, read the Respondent's comments on Student H's essay and rubric, randomly selected and interviewed other students, interviewed the CBO director, and interviewed the Respondent. The other students and the CBO director confirmed Student H's allegation that the Respondent refused to assist Student H. Principal Manolios stated that the Respondent's written feedback should be instructive for the students to help them revise their work, that it is against the School grading policy for the Respondent to base students' class grade on one essay, and that the Respondent put undue stress on Student H and other students by telling them that they would fail the class if they did not get a passing grade on the final essay.

Principal Manolios testified that teachers attend annual professional development that cover the Chancellor's Regulations, one of which deals with verbal abuse and provides:

**Chancellor's Regulation A-421**[3]

**II. Definitions**

**A. Verbal abuse is defined as language (written or oral) about or directed toward students that:**

**1. belittles, embarrasses or subjects students to ridicule; or**

**2. has or would have the effect of unreasonably and substantially interfering with a student's educational performance or ability to participate in or benefit from an educational program, school-sponsored activity or any other aspect of a student's education; or**

**3. has or would have the effect of unreasonably and substantially interfering with a student's mental, emotional, or physical well-being; or**

**4. reasonably causes or would reasonably be expected to cause a student to fear for his/her physical safety; or**

**5. reasonably causes or would reasonably be expected to cause physical injury or emotional harm to a student.**

Principal Manolios concluded from his investigation that the Respondent was running the class like a college course and making it difficult for students to do well in the class, that Respondent did not provide Student H with the support he needed, and that the Respondent's written comments to Student H were negative, caused him stress and emotional harm, were abusive, and violated the Chancellor's Regulation.

The Department presented Student G, who stated that he took classes with Respondent to learn how to write better. Student G said he observed Student H ask Respondent for assistance, that some days Respondent was upset and refused to help students, and that she had mood swings.

---

[3] D7

The Department presented Principal Akil, who was the principal during the 2016-2017 school year. He testified that on December 22, 2016 he was alerted that the Respondent fell in the hallway outside of her classroom. Principal Akil testified that the School has two campuses, and that the Respondent works on the fourth floor of a building on the Jamaica Queens campus.  Principal Akil stated that after the fall, the Respondent took him to the area where she fell, that she told him the floor was wet and slippery, that she was "unencumbered" when she fell, and that she had declined medical attention. Principal Akil stated that an incident report is required when there is an injury in the building. He told her to fill out an incident report. The Respondent's incident report stated the following:

> **This morning at approximately 7:45AM as I walked down the hall on the forth floor, I slipped and fell near my classroom 419 injuring my left leg, particularly my left knee. The floor's slickness was the cause of my fall as I was unencumbered and careful. I immediately reported the injury to the School Secretary who gave the form to complete.**

Principal Akil testified that he asked the custodial staff to check the floor, and that the Respondent spoke harshly to the custodial staff about keeping the building clean. The custodial staff checked the floor and found that it was not wet or slippery.  Principal Akil said that he and the custodial staff checked the fourth floor video camera and saw that the Respondent placed a bag on the floor, that her heel got caught in the strap, which caused her fall. Principal Akil stated that he notified the Special Commissioner of Investigation (SCI) about the Respondent's fall the same day because her explanation of what caused the fall was different than what the video showed. He thought her report of the incident was false.

The Department presented Frank Byrne, SCI investigator, who investigates criminal activity and corruption in the Department. Byrne testified that he was assigned to investigate the Respondent's incident report, that he interviewed Principal Akil, the custodial staff and the Respondent, and that he viewed the video. Byrne said that the Respondent did not mention the bag that she tripped over, and that her incident report was inconsistent with the video, which showed she was not "careful and unencumbered" as she had written on the incident report. Byrne also said that she blamed the custodial staff. Byrne concluded that the Respondent was not truthful about what caused her fall and recommended her termination.

The Department presented Robert Cetina, the custodial engineer, who stated that he had a cordial relationship with the Respondent, and that he checked the floor after Respondent's fall. He did not find that the floor was slippery, nor had it been recently waxed. In his opinion, nothing about the floor caused the Respondent to fall. He testified that he checked the fourth floor video and saw that she tripped over her bag, and that he told Principal Akil what the video showed. The video was played during the hearing. It confirmed that the Respondent tripped over her bag.

In her defense, the Respondent testified that she moved from teaching at colleges to teaching at city schools because she wanted to give back to the community, that Student H and Student G took her classes but where not in the Man's Inhumanity to Man's class at the same time, and that she was supportive of Student H and wrote him a college recommendation. She said that most of her classes are essay based because the regents are essay based, that she wants her students to get into that mindset. The Respondent said that

she explained her syllabus and grading on the first day of class and when new students

joined the class, that class participation and grades on prior assignments were considered,

but that students were required to get a minimum of a 3 on the final essay to pass the class.

Respondent stated that in her Man's Inhumanity to Man class, she reviewed the

class documents with Student H and all students, that students had two to three weeks to

do the essay, that she allowed students two drafts for their final essay, and that she had

students work with and teach each other. She testified that she went over Student H's first

draft, and that his second draft was better. She gave him time to discuss it with her and

with other students. The Respondent stated that Student H did not take the advice of the

other students. He did not discuss his second draft with her, and that she would have

discussed it with him if he had asked. She said that she advised him to take the weekend to

revise the draft, but that he handed it in on a Friday, rather than taking the weekend to

work on it.

On cross examination, the Respondent said that she always assists her students, that

she is familiar with the Chancellor's Regulation A-412, that she attended the professional

development where verbal abuse was stressed, and that she is aware that abuse could be

oral or written. She stated that she realizes words matter, and that the type of delivery,

including tone and demeanor, can carry different meanings. The Respondent stated that

she was not informed about the purpose of the meeting with Student H and his family, that

the mother had questions about the grade her son received, and that the brother and the

Principal Manolios attended the meeting. The Respondent said that she was not aware that

the mother was totally blind. She claims that she said to the mother, "Unlike you I can see

clearly," that the brother got upset about her comment to his mother and was rude to her, and that she left the meeting.

The Respondent stated that she did not stage her fall or submit a fraudulent document to the Department. She said that she wrote a brief statement on the incident report, that she did not write that the floor was wet, that she was not rude to the custodial staff, and that she received no benefit from the fall, such as time off from work.

## POSITION OF THE PARTIES

### Department of Education

The Department asserts it established the charges by the preponderance of the credible record evidence. It argues that a review of the record evidence shows that Respondent refuses to teach and educate students, and students have suffered. It claims that progressive discipline has been given, that she has broken the bond of trust with the Department, that she is beyond remediation, and termination is warranted.

The Department asserts that Respondent refused to assist Student H with the final essay assignment and he failed the class. The Department points out that students were given a few weeks to complete the final essay, and that the Respondent repeatedly refused to help Student H over that timeframe. The Department notes that it is undisputed that Respondent helped Student H with his first draft of the essay, that she wrote comments on his draft and on the rubric, and that she directed Student H to other students to get help. The Department claims that the comments the Respondent wrote were not meaningful to or understood by Student H, that the comments amounted to verbal abuse, and that Respondent's refusal to provide further assistance to Student H was neglect of her duty.

The Department argues that the Respondent told other students not to help Student H, that Student H testified that the Respondent told him "no" when he asked her for help, and that the written statements of other students corroborated Student H's testimony about his confrontations with the Respondent about her refusal to assist him. The Department points out that Student H sought assistance from peers, teachers and other resources to complete the essay, that Respondent's refusal to assist him caused him stress, anxiety, and embarrassment since Respondent assisted other students. The Department notes that it was undisputed that the Respondent was fully aware of Chancellor's Regulation A-421, and that verbal abuse could be oral or written.

The Department insists that Principal Manolios spoke to Respondent about providing support to students, that in his testimony he described her demeanor with students as unsympathetic and without compassion, and that her grading did not conform to the grading guidelines. The Department claims that the Respondent has been warned by prior School Principals about her unprofessional behavior toward students, and has a letter to her file about it. The Department points out that the Respondent's purpose is to teach students, but the syllabus for her class is college level, the lessons are vague, the issues do not fit the student population, and without support these students cannot do the work she expects, which resulted in Student H failing her class.

The Department also asserts that Respondent deliberately staged her own fall, submitted a false explanation about the cause of the fall, and attempted to defraud the Department for her personal benefit. The Department argues that the Respondent's testimony conflicted with what was seen on the video, that she refused to accept the responsibility for her fall, and that her benefit could have been instinct, such as describing

her actions as "unencumbered and careful," rather than a financial benefit. The Department claims that the Respondent's refusal to take responsibility for the fall speaks to her character, that she broke the bonds of trust with her fraudulent description of what caused the fall, and that she showed no remorse for her behavior, which warrants her termination.

### Respondent

The Respondent argues that the Department has not proven its case, that it has withheld necessary documents, and has violated her due process rights. The Respondent claims that failure to assist a student is different from verbal abuse, that Principal Manolios found her comments on one essay and one rubric inappropriate, which did not rise to the level of misconduct, and that she did not violate Chancellor's Regulation A-421. The Respondent points out that the comments on the essay were relevant, but the essay was not produced.

The Respondent argues that she was charged with a singular incident on an exact date regarding Student H, which is different from a pattern of refusing to assist students, that the Department presented evidence at the hearing to establish a pattern of her failure to assist, which is unrelated to the charge, and that she cannot be held culpable for uncharged misconduct. To support its argument, Respondent cited *Soucy v Board of Education of N. Colonie* (1973), where the Court held that uncharged misconduct could not be considered for penalty purposes.

The Respondent further argues that Student G's transcript was not produced in time for a proper cross examination of him, that Student G's transcript did not list the Man's Inhumanity to Man class, that Student G was not in the same class as Student H, and that

13

Student G's testimony should not be relied upon.

The Respondent claims that the investigation was not fair, that the disciplinary meeting and the parent meeting were convoluted, and that the evidence presented did not clarify which meeting came first. The Respondent points out that due process is a constitutionally protected right, which ensures fairness, and that the unfair investigation prevented preparation of an adequate defense, which violated her due process rights.

The Respondent also argues that there was no evidence that established that she attempted to defraud the Department, or gained any benefit from her fall. The Respondent points out that she did not file for a line-of-duty injury, that she did not take any time off work as a result of the fall, and that the statute of limitation to file a lawsuit regarding the fall is one year and has expired. The Respondent asserts that she filed the injury report as requested, that Principal's Akil's testimony that Respondent indicated that a wet floor caused her fall was not corroborated, and that Principal Akil's assertion that Respondent was rude to the custodial staff was inconsistent with the custodial staff member's testimony.

The Respondent argues that if the Hearing Officer finds her culpable for the allegations against her, her conduct does not warrant severe discipline. The Respondent cited awards by other Hearing Officers, who issued fines or reprimands to address similar behavior, and insists that a letter to file is a sufficient penalty for failure to assist.  The Respondent points out that a tenured teacher has constitutionally protected property rights to her job.

## DISCUSSION AND ANALYSIS

Based on my review of the entire hearing record, including the assessment of witnesses' credibility and the probative value of evidence, I find that the charges set forth in the Specifications are sustained or dismissed as noted below.

## SPECIFICATION 1

This Specification charges that the Respondent refused to assist Student H, which caused him stress and anxiety. Student H's testimony was credible, detailed and consistent with his complaint that Respondent refused to assist him. Principal Manolios's testimony that he investigated the complaint, interviewed other students who corroborated that Respondent refused to assist Student H, and that he found Respondent's written comments to Student H to be negative, unproductive and harmful. Student H's testimony along with Principal Manolios' investigation provide persuasive evidence that Respondent did not give proper assistance to Student H. It is undisputed that Student H sought assistance from classmates and others, attended a meeting with his family and Respondent to get clarification from the Respondent, and that he failed her class. Student H's actions provide additional evidence that the Respondent did not provide the level of assistance he needed, which made him uncomfortable, especially since she assisted other students.  In addition, the meeting with Student H and his family provided another opportunity for the Respondent to assist Student H but she used the meeting to make an inappropriate comment to the mother, rather than to provide guidance and assistance to Student H. Specification 1 is sustained.

## SPECIFICATION 2

Specification 2 claims that the Respondent attempted to defraud the Department to gain a personal benefit. The video revealed that the Respondent tripped over her bag, which she had placed on the floor outside of her classroom. However none of the evidence proves an intentional fall, or an effort to gain some benefit. Therefore, the charge is not supported in the record. Specification 2 is dismissed.

## SPECIFICATION 3

Specification 3 alleges that the Respondent completed and submitted documents about an incident that did not occur. The video established that the fall occurred, although the Respondent's submitted explanation about what caused the fall is inconsistent with the video evidence, the Respondent was not charged with a false or inaccurate explanation of the fall. Specification 3 is dismissed.

## SPECIFICATION 4

Specification 4 states that Respondent's actions in Specifications 1 could interfere with a student's well being. Student H testified credibly that he was uncomfortable with Respondent's refusal to assist him, and that he was stressed and panicked about passing her class. Principal Manolios found that Respondent's written comments were abusive, that she refused to assist Student H, and that her inappropriate grading system caused Student H undue stress. The evidence established that Student H's well being was negatively impacted. Specification 4 is sustained.

**SPECIFICATION 5**

Specification 5 states that Respondent's actions in Specifications 1 were knowingly injurious to the physical, mental and moral welfare of a child. For the reasons stated in Specifications 1 and 4, Specification 5 is sustained

## **PENALTY**

Specifications 1, 4 and 5 are sustained.  Specifications 2 and 3 are dismissed. The Complainant has met its burden of proof by the preponderance of evidence that Respondent refused to assist Student H and caused him stress and anxiety. Failure to assist a student is neglect of duty and serious misconduct that warrants discipline. In this case, it left Student H without the support he needed to pass the class. The Respondent's role is to teach by consistently assisting students and providing the support they need to complete assignments to pass her classes. The penalty for this violation must be commensurate with the Respondent's 17 years of service.

## **AWARD**

a)  Respondent shall pay a fine of $2,000, to be withheld from her salary over a period of two months.

b)  Respondent must take training that will impress upon her the need to consistently provide students with the assistance they need to pass her classes in the future. The Department will be responsible for selecting and funding the training.


Dated: January 30, 2018
Princeton, New Jersey

_____
**LISA C. CHARLES**
**Hearing Officer**

## **AFFIRMATION**

I, LISA C. CHARLES, do hereby affirm upon my oath as Arbitrator that I am the individual

described in and who executed this instrument, which is my Opinion and Award.

_____
**Lisa C. Charles**
**Hearing Officer**

# EXHIBIT "D"

**STATE OF NEW YORK**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

In the Matter of

**MARGUERITE M. BAGAROZZI,**

Charging Party,

**CASE NO. U-35863**

- and -

**BOARD OF EDUCATION OF THE CITY SCHOOL**
**DISTRICT OF THE CITY OF NEW YORK,**

Respondent.

**GLASS & KRAKOWER LLP (BRYAN D. GLASS of counsel), for Charging Party**

**KAREN SOLIMANDO, EXECUTIVE DIRECTOR OF LABOR RELATIONS (ANJANETTE D. PIERRE of counsel), for Respondent**

## DECISION OF ADMINISTRATIVE LAW JUDGE

On or about July 21, 2017, Marguerite M. Bagarozzi filed an improper practice charge alleging, as amended, that the Board of Education of the City School District of the City of New York (District)) violated §§ 209-a.1(a) and (c) of the Public Employees' Fair Employment Act (Act) when it evaluated her poorly, issued letters to her personnel file and initiated an investigation against her, which culminated in disciplinary charges pursuant to Education Law (EL) § 3020-a. The District denied that it violated the Act. A hearing was held on March 14, 2018, at which both parties were represented. Both parties filed post-hearing briefs.

## FACTS

Bagarozzi has been employed as a high school English teacher by the District since 2000. Prior to that, she was employed as an administrator and instructor at the college level. During her tenure with the District, she worked at William Cullen Bryant

High School and, more recently, at Queens Academy High School, which has two sites in Queens, New York.  In September of 2007, she was assigned to the Jamaica, New York site.  Until 2017, Bagarozzi's performance had been rated consistently as "satisfactory," or "effective/highly effective."

As a teacher in the District, Bagarozzi is represented by the United Federation of Teachers (UFT).  She was active with the union while at Queens Academy High School, serving for two years as the chapter chairperson, and then as a "surrogate" chapter chairperson for the Jamaica campus for the 2016-2017 school year.  Bagarozzi testified that she had been asked by the school's chapter leader, Jennifer Squires, to assist her in representing teachers at the Jamaica site since the school has split locations.  The position was not formally recognized at the school, nor was it elected by the membership or formally appointed by the UFT.  Bagarozzi also served on the school safety committee.

Shomari Akil became principal at Queens Academy High School in the fall of 2015.  He rated Bagarozzi as "highly effective" in a May 2016 observation.[1]  Bagarozzi also received a "highly effective" rating on her "Measures of Teacher Performance" (MOTP) scale for the 2015-2016 school year.[2]

During the 2016-2017 school year, Bagarozzi filed multiple grievances against the school administration on behalf of herself and others.  She also filed safety reports through the UFT, but in her name.  On November 14, 2016, she filed a grievance regarding parking permits.[3]  In or around December of 2016, she grieved the

---

[1] Charging Party's Ex 5.
[2] Charging Party's Ex 6.
[3] Charging Party's Ex 8.

administration's alleged failure to properly provide special education services at the

Jamaica site.[4]  Shortly thereafter, she grieved the administration's alleged failure to file

an Occurrence Report about an incident with a student.[5]  On May 1, 2017, she filed a

grievance for improper post-evaluation procedures relating to observations on April 20

and 26, 2017.[6]  And, on May 23, 2017, she filled a grievance relating to a letter to file

which was issued to her more than three months after an incident, in contradiction of

contractual provisions.[7]

During the second half of the 2016-2017 school year, Bagarozzi began receiving

lower ratings on her performance evaluations.  One, on February 27, 2017, came from a

new assistant principal hired by Akil in the spring of 2017, Nathifa Morris, and resulted

in a "developing" MOTP rating for Bagarozzi.  In that same timeframe, Morris also called

Bagarozzi into a meeting to discuss her grading policy and issued a March 10, 2017

letter addressing Bagarozzi's failure to attend a staff meeting, which Bagarozzi claimed

conflicted with one of her assignments.[8]  Bagarozzi also received a March 24 notice of a

disciplinary meeting, which never took place.[9]

On April 26, 2017, Bagarozzi was again observed by Morris and received

another negative evaluation.[10]  There were also April and May observations by Akil, for

which Bagarozzi claimed to have not received timely written reports or verbal feedback.

During this time period, there was also a letter issued by another assistant principal,

---

[4] Charging Party's Ex 10.
[5] Charging Party's Ex 11.
[6] Charging Party's Ex 17.
[7] Charging Party's Ex 18.
[8] Charging Party's Ex 13.
[9] Charging Party's Ex 14.
[10] Charging Party's Ex 16.

Case No. U-35863                                                                            -4-

Derek Phillips, which was removed from her file in October of 2017 as "uncontractual."[11]

Although her overall rating for the school year was initially "developing," it was adjusted

upwards to "effective" after a recalculation of the student performance component, due

to an error which affected several teachers in the school.

In May of 2017, Bagarozzi was served with disciplinary charges under EL §

3020-a. Those charges were initated by Akil, who also reassigned Bagarozzi out of her

classroom during their pendency, pursuant to standard District policy. There were two

components to the charges; one related to an investigation commenced by Akil in the

spring of 2017 relating to a December 2016 slip and fall on school premises, and the

other related to a 2015 incident with a student, which was prior to Akil's tenure at

Queens Academy High School. Specifically, the slip and fall incident involved a claim

by Bagarozzi that she slipped on a wet floor in the hallway, which was contradicted by

school custodians and a surveillance video. The issue initially was referred by Akil to

the District's Office of Special Investigations, which found it to be substantiated in a May

2017 report.[12] The 2015 incident involved a claim that Bagarozzi did not assist a

student when she failed to respond to his questions regarding negative feedback she

had given him. The § 3020-a arbitrator dismissed the charge as to the slip and fall

claim. The other aspect of the charge, relating to the 2015 student incident, was

sustained and Bagarozzi was fined $2,000.[13]

Bagarozzi testified that during the spring of 2017, Akil approached her and asked

why she could not resolve her issues directly with him, instead of involving the UFT.

---

[11] Tr, at 72; Charging Party's Ex 19.
[12] Charging Party's Ex 23.
[13] Charging Party's Ex 25.

However, Akil testified that he did not recall making that statement.  Bagarozzi testified that during the summer of 2017, she was offered a summer school position, but turned it down because of the pending § 3020-a case and because she was "trying to be honorable and do the right thing."  She also lost per session work at Queens Academy in tutoring, college advisement, and the like.

For its case, the District presented Morris and Akil.  Morris testified that she was not aware of a surrogate position within the UFT and had not been informed by anyone, including Squires, that Bagarozzi held that role.  She also said that she was unaware of Bagarozzi's grievance and reporting activity against the administration.  While she stated that she knew that Bagarozzi attended the school safety meetings, Morris had no knowledge that Bagarozzi attended as a UFT representative or had made safety complaints.  In fact, the one school safety meeting that Morris attended, was not attended by Bagarozzi.  Morris said that Akil was usually at those sessions.

Morris explained that her evaluations of Bagarozzi were based on her observations and concerns she had with Bagarozzi's pedagogy.  She specifically noted unclear learning objectives, a lack of modelling for students, and apparent confusion among students as to the teacher's expectations.  Morris also explained that the staff meeting that Bagarozzi failed to attend was held during lunch common planning time and specifically discussed the universal grading policy.  That grading policy was of concern to Morris, and the meeting she subsequently held with Bagarozzi, which was not disciplinary, discussed that.  Within a week, Bagarozzi revised her grading system. Morris asserted that the letter to Bagarozzi's file regarding her grading concerns and the missed staff meeting, was not a disciplinary letter.

Morris also testified that Akil did not discuss Bagarozzi's union activity with her. She said that she showed Akil her first observation report for Bagarozzi and advised him that she had told the teacher that she was available to help her.  Additionally, she did not discuss the disciplinary charges with Akil and was informed of them by the District Superintendent after Bagarozzi's reassignment.

Like Morris, Akil also disclaimed any knowledge of a surrogate UFT post.  He said that he, at times, knew that Bagarozzi attended school safety meetings.  He, however, denied any animus toward the UFT.  He also denied knowledge of Bagarozzi's grievance activity and said that the UFT, and not Bagarozzi, is the entity that files grievances on behalf of members.

According to Akil, Bagarozzi often had difficult interactions with students, requiring mediation by the administration.  He said that he never told Phillips or Morris how to evaluate Bagarozzi. He also maintained that he has no role in computing end-of-year ratings and explained that they are devised according to a formula that factors in the observations, plus student performance.  Akil testified that he had noted that Morris' observation of Bagarozzi was significantly different from his the year before, and said he concluded that the teacher's performance was heading in a different direction.

With respect to the investigation he initiated against Bagarozzi, Akil advised that he felt it was his responsibility to do so, given the conflicting stories he received about the slip and fall, and the video he viewed, which showed that the teacher tripped over her handbag which was on the floor.  His only role, he said, was to forward the information to the Office of Special Investigations.  He then received a report back,

which found the claim of fraudulent reporting to be substantiated and recommended that Bagarozzi be removed from the classroom and not participate in per session or summer school work.

Regarding the disciplinary charges brought against Bagarozzi, Akil testified that the determination to pursue them was made by the District and the reassignment out of the classroom was pursuant to District policy. He said he had no role in the proceedings, other than to testify as a witness. He also claimed that he had no role in determining to charge Bagarozzi for the 2015 incident.

On cross-examination, Akil testified that during his first year at Queens Academy, he had issues with Bagarozzi's teaching, but did not document them. He could not recall if she was involved in grievance activity, but knew she had filed some grievances during his second year.[14] He, however, did not recall her challenging observation procedures or filing a safety complaint. Akil was aware, however, of her complaint that the school did not accurately report incidents with students and acknowledged that such was prior to his making his report to the Office of Special Investigations. He testified that he could not recall how he felt about Bagarozzi's complaint.

## DISCUSSION

In order to show retaliation under subsections (a) and (c) of § 209-a.1, a charging party must prove, by a preponderance of the evidence, that he or she was engaged in protected activity under the Act, that such activity was known to the person who effectuated the adverse action, and that the action complained of would not have been taken "but for" the protected activity.[15] That third element, requiring a showing of

---

[14] This testimony was contradictory to his testimony on direct.
[15] *City of Salamanca,* 18 PERB ¶ 3012 (1985).

unlawful motivation, can be proved through direct evidence, such as oral statements or documents, or through circumstantial evidence.[16]  Circumstantial evidence may include disparity of treatment, the timing and context of the employment action, or a pretextual rationale for adverse actions taken.[17]  Regardless of its form, circumstantial evidence must be sufficient to give rise to an inference that unlawfully motivated interference or discrimination influenced the employer's conduct.  Once the charging party establishes its prima facie case, the burden shifts to the respondent to establish the legitimacy of its action.  If the respondent establishes a legitimate, non-discriminatory reason, the burden then shifts back to the charging party to prove that to be pretextual.

Bagarozzi's engagement in protected activity is not at issue.  "Protected activity" is that identified by the Act as activity in pursuit of protected rights.  The fact that Bagarozzi allegedly served as a "surrogate" to help address employee concerns at the Jamaica site of Queens Academy is not critical to this finding.  Apart from that surrogate activity, the record establishes that Bagarozzi filed grievances, as well as other actions against the administration, with the support of Squires.  Independent of her alleged surrogate work, those actions constitute activity protected by the Act.

The next element of proof addresses the school administrators' knowledge of Bagarozzi's involvement in protected activity.  It is clear that Akil knew of that, inasmuch as he acknowledged such during his testimony.  I find that Morris, however, was not aware.  She was a very credible witness, who established herself as removed from the

---

[16] *Town of Hempstead,* 19 PERB ¶ 3022 (1986); *County of Nassau,* 35 PERB ¶ 3045 (2002), *confirmed sub nom CSEA v New York State Pub Empl Relations Bd,* 2 AD3d 1197, 36 PERB ¶ 7019 (3d Dept 2003).
[17] *County of Cattaraugus and Sheriff of Cattaraugus County,* 24 PERB ¶ 3001 (1991); *Hudson Valley Comm Coll,* 25 PERB ¶ 3039 (1992); *County of Wyoming,* 34 PERB ¶ 3042 (2001).

role of responding to Bagarozzi's grievances and complaints. In fact, there was no evidence to refute Morris' unequivocal testimony that she was not aware of Bagarozzi's protected activity, and none of Bagarozzi's complaints were directly made against Morris such as would allow knowledge to be imputed.

The last prong of the standard of proof looks to the nexus between the protected activity and the adverse action taken. Where the first two elements of the *City of Salamanca* test have been met, as is the case here, the analysis then considers whether the action resulted from the employee's involvement in protected activity. Essentially, Bagarozzi must establish that "but for" her protected activity, she would not have been the subject of the administration's negative actions toward her.[18]

Based on the totality of the evidence presented by Bagarozzi in support of her prima facie case, I find that she has satisfied her burden of proof with respect to actions attributed to Akil. Important in this regard is the Board's recognition that circumstantial evidence is sufficient so long as it gives rise to a reasonable inference that unlawful motivation was present. Here, the incongruity of her status after engaging in protected activity compared to her standing before, the extent of the negative actions she incurred in a relatively short period after her challenges to Akil's administration of the school, and the fact that the § 3020-a charges included a two-year old incident, all factor into my analysis. Furthermore, while timing alone is insufficient to establish the required nexus,[19] timing may be considered among other circumstantial factors. Lastly, I credit Bagarozzi's testimony about Akil's comment made to her, wherein he indicated his desire to bypass the union in addressing her complaints.

---

[18] *City of Salamanca,* 18 PERB ¶ 3012.
[19] *State of New York (SUNY at Buffalo),* 33 PERB ¶3020 (2000).

This is not a situation in which administrators are new to a school and judge a teacher's performance less favorably than did their predecessors. Nor is it a case in which a teacher who was favorably rated under a different paradigm receives poorer ratings once the standards and criteria have changed. There is no question that for her entire tenure, until 2017, Bagarozzi had been rated as "satisfactory" or "effective," even "highly effective." That was the case even after Akil first came to her school and rated her himself.

The tipping point in this case appears to have been when Bagarozzi, in late 2016 and early 2017, began challenging Akil through grievances and complaints to external entities. I credit her testimony as to her role as a union "surrogate," and whether or not that had meaning to the administration, it impliedly signaled to her a heightened call to duty. Following closely on the heels of her actions were a series of reactions by Akil, most notably the initiation of a special investigation and the disciplinary charges which followed.

Based on the foregoing, the record in this case establishes the required nexus between the actions complained of with respect to Akil, and Bagarozzi's protected activity. Bagarozzi offers a compelling chain of adverse actions stemming from her intensified activities with respect to grievances and her complaint about the school's inadequate reporting of incidents. That proof is enhanced by Akil's statements, which reflect his disdain for union involvement.

The inquiry then considers whether the District effectively proved that it acted for legitimate business reasons. I find that it did not. Akil was not credible as a witness; he was not forthcoming in his testimony and could not recall his behavior on a number of

Case No. U-35863                                                                                    -11-

issues of significance.

It must be noted that I am not finding liability with respect to the observation and

evaluation completed by Morris, or the meeting she held with Bagarozzi regarding her

grading policy, as well as the letter which documented that. Having found that Morris

had no knowledge of Bagarozzi's protected involvement, a prima facie case with

respect to her was not established. Even if that was not the case, Morris credibly

testified to the legitimacy of her concerns and her focus on pedagogy and student-

teacher interaction.

With respect to Akil, however, there is no contest to the fact that his negative

actions toward Bagarozzi followed on the heels of her intensified actions against him.

That includes the May 18, 2017 letter he added to Bagarozzi's file regarding a student

incident, as well as the investigation he commenced against her. His claims that he felt

he had no discretion in initiating the special investigation, were not substantiated by

documentary evidence and were not credible. And, his asserted lack of involvement in

proferring the disciplinary charges is suspect. Indeed, he offered no explanation for

how a two-year old incident worked its way into a specification.

I add, however, that I do not find damage to Bagarozzi with respect to the lack of

summer school work. She testified that it was offered to her, but she turned it down out

of respect for the pendency of the disciplinary charges. The District cannot be held

accountable for a decision she voluntarily made, despite the asserted rationale for her

reason.

On the basis of the foregoing, I find that the District violated §§ 209-a.1(a) and (c)

of the Act when Akil initiated an investigation against Bagarozzi, when he supported

Case No. U-35863                                                                                   -12-

disciplinary charges against her, when he denied her per session work, and when he

issued his May 18, 2017 disciplinary letter.

THEREFORE, IT IS ORDERED THAT the District shall forthwith:

1. Cease retaliating against Bagarozzi for her engagement in protected activity;

2. Cease interfering with Bagarozzi's right to engage in protected activity;

3. Remove from Bagarozzi's file the letter dated May 18, 2017;

4. Make Bagarozzi whole for lost per session work and the $2,000 fine she

   incurred as a result of the disciplinary charges brought against her, including

   interest at the currently prevailing maximum legal rate; and

5. Sign and post the attached notice at all physical and electronic locations

   customarily used to post notices to unit employees.

Dated at Brooklyn, New York
this 16th day of August, 2018

Elena Cacavas
Administrative Law Judge

# NOTICE TO ALL EMPLOYEES

**PURSUANT TO**
THE DECISION AND ORDER OF THE

**NEW YORK STATE
PUBLIC EMPLOYMENT RELATIONS BOARD**

and in order to effectuate the policies of the

**NEW YORK STATE
PUBLIC EMPLOYEES' FAIR EMPLOYMENT ACT**

we hereby notify all employees of Board of Education of the City School District of the City of New York (District) that the District will:

1. Cease retaliating against Bagarozzi for her engagement in protected activity;

2. Cease interfering with Bagarozzi's right to engage in protected activity;

3. Remove from Bagarozzi's file the letter dated May 18, 2017; and

4. Make Bagarozzi whole for lost per session work and the $2,000 fine she incurred as a result of the disciplinary charges brought against her, including interest at the currently prevailing maximum legal rate.

Dated . . . . . . . . .           By . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**On behalf of the Board of Education of the
City School District of the City of New York**

*This Notice must remain posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

The following is an extract of PERB's Rules of Procedure, 4 N.Y.C.R.R. Parts 200-215. Any party filing exceptions or other papers with the Board should consult the Rules of Procedure to ensure compliance with all requirements.  The Rules are available at: http://perb.ny.gov/PERBRules.asp.

**Exceptions to Decision of Director; Exceptions to Administrative Law Judge's (ALJ) Decision and Recommended Order; Action by Board**

(a)  Within 15 working days after receipt of the decision of the Director or the decision and recommended order of the ALJ, a party may file with the Board an original and four copies of a statement in writing setting forth any exceptions thereto, and a separate original and four copies of a brief in support thereof, together with proof of service of copies of such exceptions and brief upon each party.  A copy of such exceptions and briefs shall be simultaneously served upon all other parties.

(b)  The exceptions shall:

(1)     Set forth specifically the questions of procedure, fact, law or policy to which exceptions are taken;

(2)     Identify that part of the decision or order to which objection is made;

(3)     Designate by page citation the portions of the record relied upon; and

(4)     State the grounds for exceptions. An exception to a ruling, finding, conclusion or recommendation which is not specifically urged is waived.

(c)  The Board shall not determine violations of the Act and affirmative defenses that were not properly pled.

**Cross-Exceptions**

Within seven working days after receipt of exceptions, any party may file an original and four copies of a response thereto, or cross-exceptions and a separate brief in support thereof, together with proof of service of copies of these documents upon each party to the proceeding. Within seven working days after receipt of cross-exceptions, any party may file an original and four copies of a response thereto, together with proof of service of a copy thereof upon each party to the proceeding.

**Request for Extension of Time**

A request for an extension of time within which to file exceptions and briefs shall be in writing, and filed with the Board before the expiration of the required time for filing, provided that the Board may extend the time during which to request an extension of time because of extraordinary circumstances. A party requesting an extension of time shall notify all the parties to the proceeding of its request and shall indicate to the Board the position of each other party with regard to such request.

**Objection to Certification Without Election**

A written objection to the Director's determination that an employee organization should be certified without an election may be filed within five working days after receipt of the Director's determination. A party may file a response to the objection within five working days after its receipt of the objection. The objection and any response must be served on all parties.

## Oral Argument Before the Board

If a party desires to argue orally before the Board, a written request with reasons therefore shall accompany the exceptions filed, the response thereto, or the cross-exceptions filed and be prominently displayed on the first page of the party's papers. The Board may grant such a request; it may also direct oral argument on its own motion.

## Board Action

(a)  Upon receipt of the case, the Board may adopt, modify or reverse the Director's or ALJ's decision or order.

(b)  Unless a party files exceptions to the decision and recommended order of the Director or ALJ within 15 working days after receipt thereof, the decision and any accompanying order will be final, except that the Board may, on its own motion, decide to review any remedial action recommended within 20 working days after receipt by the parties of the decision and recommended order.

* * * * * * * * * * * *

## Party

The term "party", as used in PERB's Rules of Procedure, means any public employee, employee organization or public employer filing a charge, petition or application under the Act or these Rules; any public employee, employee organization or public employer named as a party in a charge, petition or application, filed under the Act or these Rules; or any other public employee, employee organization or public employer whose timely motion to intervene in a proceeding has been granted.

## Working Days

The term "working days", as used in PERB's Rules of Procedure, shall not include a Saturday, a Sunday, or a legal holiday.

## Filing; Service

(a)  The term "filing", as used in PERB's Rules of Procedure, shall mean delivery to the Board or an agent thereof, or the act of mailing to the Board, or deposit with an overnight delivery service for overnight delivery.

(b)  The term "service", as used in PERB's Rules of Procedure, shall mean delivery to a party or the act of mailing to a party, or deposit with an overnight delivery service for overnight delivery.

* * * * * * * * * * * *

## NOTICE TO PARTIES

### Judicial Appeal of Board Orders.

A party may appeal a final order of the Board by filing with the court and serving the necessary parties the pleadings and papers required by Article 78 of the New York Civil Practice Law and Rules (CPLR) and New York Civil Service Law (CSL) §213 within thirty days after service of the Board's order. The Board's "filing" and "service" definitions (above) do not govern the filing and service requirements of the CPLR or CSL, which are covered by the terms of those statutes. Failure to comply with a final order of this agency will result in an enforcement proceeding in New York Supreme Court pursuant to CSL §213.

(09/17)



**STATE OF NEW YORK**
**PUBLIC EMPLOYMENT RELATIONS BOARD**
**55 HANSON PLACE**
**SUITE 700**
**BROOKLYN, NY 11217-1579**



7018 1130 0000 6929 1482

Bryan D. Glass, Esq.
Glass & Krakower, LLP
100 Church Street, Suite 800
New York, NY 10007

EXHIBIT "E"



**Division of
Human Rights**

NEW YORK STATE
DIVISION OF HUMAN RIGHTS

---

NEW YORK STATE DIVISION OF
HUMAN RIGHTS on the Complaint of

MARGUERITE M. BAGAROZZI,

                 **Complainant,**

      v.

CITY OF NEW YORK, DEPARTMENT OF
EDUCATION,

                 **Respondent.**

DETERMINATION AND
ORDER OF DISMISSAL FOR
ADMINISTRATIVE
CONVENIENCE

Case No.
10189699

Federal Charge No. 16GB704061

---

On 7/21/2017, Marguerite M. Bagarozzi filed a verified complaint with the New York State Division of Human Rights ("Division") charging the above-named respondent with an unlawful discriminatory practice relating to employment because of age, race/color, and opposed discrimination/retaliation in violation of N.Y. Exec Law, art. 15 ("Human Rights Law").

Pursuant to Section 297.3 of the Human Rights Law, the Division finds that noticing the complaint for hearing would be undesirable and the complaint, therefore, is ordered dismissed on the grounds of administrative convenience for the following reason(s):

The Complainant intends to pursue federal remedies in court, in which forum all the issues concerning the question of discrimination charged can be resolved.

Section 297.9 of the Human Rights Law provides that:

... where the Division has dismissed such complaint on the grounds of the administrative convenience, ... such person shall maintain all rights to bring suit as if no complaint had been filed.

PLEASE TAKE NOTICE that any party to this proceeding may appeal this Determination to the New York State Supreme Court in the County wherein the alleged unlawful discriminatory practice took place by filing directly with such court a Notice of Petition and Petition <u>within sixty (60) days after service of this Determination</u>. A copy of this Notice and

Petition must also be served on all parties including General Counsel, State Division of Human Rights, One Fordham Plaza, 4th Floor, Bronx, New York 10458.  DO NOT FILE THE ORIGINAL NOTICE AND PETITION WITH THE STATE DIVISION OF HUMAN RIGHTS.

Your charge was also filed under Title VII of the Civil Rights Act of 1964. Your charge was also filed under the Age Discrimination in Employment Act (ADEA).  Enforcement of the aforementioned law(s) is the responsibility of the U.S. Equal Employment Opportunity Commission (EEOC).  You have the right to request a review by EEOC of this action.  To secure review, you must request it in writing, within 15 days of your receipt of this letter, by writing to EEOC, New York District Office, 33 Whitehall Street, 5th Floor, New York, New York 10004-2112.  Otherwise, EEOC will generally adopt our action in your case.

Dated:    01\08\18
        Brooklyn, New York

STATE DIVISION OF HUMAN RIGHTS

By:    _____
        William LaMot
        Regional Director

PITNEY BOWES

NYC DEPARTMENT OF EDUCATION

2018 JAN 10 PM 3: 03

LEGAL SERVICES

$460

02
0001906191 JAN 10 2018
MAILED FROM ZIP CODE 11217

UNITED STATES POSTAGE

NEW YORK
NY 100
09 JAN '18
PM 7 L

City of New York, Department of Education
Attn: Nancy Morisseau, Agency Attorney
Office of Legal Services, 52 Chambers Street,
Room 308
New York, NY 10007

STATE OF NEW YORK
EXECUTIVE DEPARTMENT
**DIVISION OF HUMAN RIGHTS**
55 HANSON PLACE, ROOM 3o4
BROOKLYN, NY 11217